UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

───────────────

N⁰ 08-CV-1812 (JFB)

───────────────

RICARDO FISHER,

Petitioner,

VERSUS

MICHAEL B. MUKASEY,

Respondent.

───────────────

MEMORANDUM AND ORDER
October 21, 2008

───────────────

JOSEPH F. BIANCO, District Judge:

This action originated as a petition for review of a removal order filed in the United States Second Circuit Court of Appeals pursuant to 8 U.S.C. § 1252. Petitioner, a lawful permanent resident convicted of two aggravated felonies, challenged his removal, asserting that he obtained derivative citizenship when his father naturalized before petitioner's eighteenth birthday. The Second Circuit determined that there were genuine issues of material fact regarding petitioner's nationality claim and, therefore, transferred the matter to this Court for a *de novo* hearing and decision on petitioner's nationality claim pursuant to 8 U.S.C. § 1252(b)(5)(B).

After conducting a *de novo* hearing on this matter and carefully reviewing the evidence and submissions by both parties, the Court finds that petitioner has failed to demonstrate by a preponderance of the evidence that he was in his father's "legal custody" at the time of his father's naturalization, or at any time between his father's naturalization and petitioner's eighteenth birthday. Specifically, the testimony and documentary evidence offered by petitioner was inconsistent in material respects and simply not credible in light of the entire record. Moreover, such evidence was contradicted by other documentary evidence, including the father's own sworn naturalization application, which suggested that the father was residing in Deer Park and petitioner was not residing with him, and petitioner's father failed to offer a credible explanation for such

contradiction. In short, as discussed in detail below, petitioner has failed to meet his burden of establishing that petitioner's father had actual, uncontested custody over him at any point during the above-referenced time frame. Therefore, petitioner's nationality claim is denied.

I. BACKGROUND

Petitioner, a twenty-nine year old unmarried male, is a native of Jamaica who was admitted to the United States as a lawful permanent resident on October 31, 1987. (Administrative Record ("R.") at 46.) His parents were legally divorced in Jamaica in 1987 and lived in the United States thereafter. (R. at 49.) Their divorce decree did not specify which parent retained legal custody of petitioner. (R. at 49, 251.) Petitioner's father was naturalized as a United States citizen on July 14, 1996, when petitioner was seventeen years of age. (R. at 49.)

On August 31, 2004, petitioner was convicted in County Court in the State of New York, Nassau County, of criminal possession of stolen property in the third degree and attempted sexual assault in the first degree. (R. at 46.) He was sentenced to one year of imprisonment for each count. (R. at 46.)

A. Removal Proceeding

On March 11, 2005, the Department of Homeland Security instituted removal proceedings against petitioner pursuant to Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act of 1952, as amended ("INA"), 8 U.S.C. § 1227(a)(2)(A)(iii), based upon his conviction for two aggravated felonies. (R. at 46-47.) During the administrative proceedings, petitioner challenged his removeability on the grounds that he obtained derivative citizenship under former Section 321(a) of the INA, 8 U.S.C. § 1432(a)(1994), *repealed and replaced by* the Child Citizen Act of 2000 ("CCA"), Pub. L. No. 106-395, § 101, 114 Stat. 1631 (Oct. 30, 2000) (effective February 27, 2001 and codified at 8 U.S.C. § 1431). The statute, applicable because it was in effect at the time of petitioner's eighteenth birthday, states, in relevant part, that

> a child born outside of the United States of alien parents ... becomes a citizen of the United States upon fulfillment of the following conditions:
> ...
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents … and if
> (4) Such naturalization takes place while such child is under the age of eighteen years; and
> (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

Specifically, petitioner alleged that, because his parents were legally separated and his father had legal custody of him, he derived citizenship through his father when his father was naturalized on July 14, 1996, prior to petitioner's eighteenth birthday on October 31, 1996. (R. at 46-48.)

Petitioner testified in removal

2

proceedings on May 5, 2005, that he lived with his grandmother from 1987, when he arrived in the United States, until 1990, when he began residing with his father. (R. at 113.) He further stated that he lived with his father until 1997, first in Queens, New York until approximately 1992 or 1993, when they moved to "457 Deer Park Avenue" in "Komack, New York." (R. at 113-14.) Petitioner stated that he did not live with his mother after moving in with his father, but did spend "weekends and stuff with her like that." (R. at 116.)

When removal proceedings continued on May 26, 2005, petitioner submitted an affidavit from his father, Michael Paul Fisher ("Mr. Fisher"), sworn on May 25, 2005, stating that petitioner, petitioner's mother and petitioner's sister Stephanie resided with him at 121-31 Farmer's Boulevard in St. Alban's, New York, starting in October of 1987, when the three arrived in the United States. (R. at 249.) The affidavit went on to state that, in 1994, petitioner's mother moved out of the residence, but petitioner and his sister continued to reside with Mr. Fisher. (R. at 249.) In 1997, petitioner and his sister moved with Mr. Fisher to Deer Park, New York and petitioner resided with him there until he moved out to live with a girlfriend. (R. at 249.) Mr. Fisher did not specify the date on which petitioner left the residence, but he stated that he had full custody of petitioner on the date of his naturalization, July 14, 1996. (R. at 249.) Petitioner also submitted an affidavit from his mother, Janet Fisher, sworn on May 25, 2005, that echoed Mr. Fisher's relevant testimony, specifying that, when she moved out of Mr. Fisher's residence in 1994, she moved to 113-11 Delevan Street in Queens, New York. (R. at 247.)

The government submitted the naturalization application of Mr. Fisher, signed on submission on October 18, 1995, and again before an immigration officer on June 25, 1996, wherein Mr. Fisher stated that: (1) his current United States mailing address was 457 Skidmore Road in Deer Park, New York; (2) his wife, Valerie Fisher, shared the same address; (3) he ran his own business located at the same address; (4) petitioner and petitioner's sister, Stephanie, resided at 121-31 Farmer's Boulevard in St. Alban's, New York; and (5) his sons, Michael and Korey, resided "with me." (R. at 241-42.) The government also produced the fingerprint card Mr. Fisher signed and submitted on October 18, 1995, which listed his residence as 457 Skidmore Road in Deer Park, New York. (R. at 245.)

Petitioner submitted a series of receipts issued by Mr. Fisher's home improvement business, "Mike Home Improvements," that list its address as 121-31 Farmer's Boulevard in St. Alban's, New York (R. at 223-30), as well as his high school transcript from Jamaica High School in Jamaica, New York, which he attended from September of 1993 until January 6, 1995. (R. at 240.) The transcript lists his address as 121-31 Farmer's Boulevard and his mother as Janet Fisher. (R. at 240.) There is no entry under "father's full name." (R. at 240.)

On June 16, 2005, Mr. Fisher appeared before the Immigration Judge (hereinafter, "IJ") in petitioner's removal proceedings and testified that, at the time of his naturalization in 1996, he resided at 121-31 Farmer's Boulevard in St. Alban's, New York, with petitioner and petitioner's sister Stephanie, who lived on the first floor with him, and petitioner's mother, Janet, who lived on the second floor. (R. at 177-78, 182.) He further testified that he bought the property located at 457 Skidmore Road, Deer Park, New York in 1993 and moved his second wife (Valerie)

3

and their son (Travis) into the residence there in 1995, but did not actually reside there until 1997. (R. at 180-81.) When questioned by the IJ as to why he listed the 457 Skidmore Road address, rather than the 121-31 Farmer's Boulevard address, on his naturalization application, Mr. Fisher testified to the following: "Well, the reason for that because I know that 457 Skidmore Road is going to be my permanent residence because I was planning to move and everything. So that's why I put that on the application." (R. at 183.) He went on to state that he was having difficulties with his wife Valerie at the time and so he "was living at Farmer's Boulevard because that's where [his] business and everything was." (R. at 185.)

After conducting this evidentiary hearing on the issue, the IJ ruled, on June 16, 2005, that petitioner did not derive United States citizenship from his naturalized father because he failed to demonstrate that his father had legal custody of him at any point during the relevant time, as required by subsection (3) of the statute. (R. at 60.) The IJ determined that petitioner was removeable and ordered him deported from the United States to Jamaica. (R. at 60.)

Petitioner appealed the ruling to the Board of Immigration Appeals on July 15, 2005 (R. at 38), which affirmed the decision of the IJ on November 14, 2006. (R. at 2-3.)

B. The Second Circuit

Petitioner then appealed to the United States Court of Appeals for the Second Circuit. On April 24, 2008, the Second Circuit issued a Summary Order containing the following rulings: "(1) the proceedings are TRANSFERRED to the United States District Court for the Eastern District of New York for a *de novo* hearing on petitioner's nationality claim and a decision on that claim; (2) petitioner's motion for a stay of removal pending the District Court's ruling on the nationality claim is GRANTED; (3) petitioner's motion for *in forma pauperis* status is GRANTED; and (4) petitioner's petition for review is HELD IN ABEYANCE." *Fisher v. Mukasey*, No. 05-6538-ag, 2008 WL 1848804, at \*\*2 (2d Cir. Apr. 24, 2008).

After reviewing the applicable law, the Second Circuit noted that "[i]n this case, the only disputed issue was whether petitioner's father had 'legal custody' of petitioner at the time the father was naturalized." *Id.* at \*\*1. The Court then determined that, with respect to that legal issue, there were issues of fact that needed to be resolved at a *de novo* hearing:

> The record reveals a genuine issue of material fact as to whether petitioner's father had actual, uncontested custody over him at the time petitioner's father was naturalized. Petitioner presented affidavits and sworn testimony to support his contention that his father had legal custody over him at the time his father was naturalized. The Government submitted documentary evidence to the contrary that purported to contradict petitioner's evidence. Because there is a genuine issue of fact, and petitioner's evidence would be sufficient to support a finding that his father was naturalized, there is a genuine issue of material

4

fact. Because petitioner's last known address was in Deer Park, New York, this Court must transfer the proceeding to the United States District Court for the Eastern District of New York for a hearing and decision as to whether petitioner was in his father's legal custody at the time of his father's naturalization.

*Id*. at **2 (citations omitted). Thus, as noted above, the Second Circuit transferred the proceedings to this Court pursuant to 8 U.S.C. § 1252(b)(5)(B), for a *de novo* evidentiary hearing and a determination regarding the claim. *Id.*

### C. Proceedings Before This Court

This matter was assigned to the undersigned on May 1, 2008. Pursuant to the Second Circuit's direction, the Court issued an Order on June 9, 2009 to conduct a telephone conference with the parties to schedule a *de novo* hearing. On July 8, 2008, the respondent submitted a letter, prior to such conference, outlining the government's position regarding the proper scope of the *de novo* hearing. On July 14, 2008, the Court conducted the conference and set the hearing for July 24, 2008. Petitioner was then transported to New York and represented himself *pro se* at the *de novo* hearing.

The hearing took place on July 24, 2008. Petitioner called himself and his father, Mr. Fisher, as witnesses. Respondent called no witnesses. In addition to the testimony at the hearing, the Court, with the consent of both sides, received into evidence the entire certified record from the immigration proceedings. (July 24, 2008 Hearing Transcript ("Hearing Tr."), at 8-9.) A summary of the testimony given at the *de novo* hearing before this Court is set forth below.

At the hearing, petitioner testified to the following: "My father became a citizen in 1996. I was in the full custody of my father. He was supplying all of my needs, as far as clothing, religious – just overall. He was just the main provider of everything for me." (Hearing Tr. at 10-11.) Petitioner was cross-examined by the government regarding petitioner's claim. In particular, when asked to explain the discrepancy between his testimony before the IJ that he lived with his father at "457 Deer Park Avenue" at the time of his father's naturalization and his father's testimony in the same proceedings that they resided at 121-31 Farmer's Boulevard, petitioner stated: "That was ten, fourteen years ago, and I wasn't precise on the exact dates." (Hearing Tr. at 19.) When asked whether his mother ever moved from the 113-11 Delevan Street address she adopted in 1994 to the 121-31 Farmer's Boulevard address, as Mr. Fisher testified before the IJ that she did, petitioner responded that she did not. (Hearing Tr. at 21.) When read the transcript of his father's testimony before the IJ, petitioner then responded: "Like I said, the dates, the dates are – she was, she was living [at 121-31 Farmer's Boulevard] at one particular point and moved out. As far as my recollection of it, I'm not too sure of the dates." (Hearing Tr. at 22-23.)

Petitioner also testified about his relationship with his mother in the years following his parent's divorce, but prior to his father's naturalization, stating: "... for the record, she is my mother. She was entitled to see us, even though she did not participate in taking care of us, as far as financially or anything else. She is still my mother." (Hearing Tr. at 24.) He further stated that he

5

had traveled to Jamaica with his mother when he was "around sixteen." (Hearing Tr. at 30.)

Finally, petitioner argued that the receipts for "Mike Home Improvement" bearing the address 121-31 Farmer's Boulevard proved that Mr. Fisher resided at that location, presumably because Mr. Fisher testified before the IJ that he ran his business through his home. (Hearing Tr. at 33-34.)

Mr. Fisher also testified as a witness for petitioner at the *de novo* hearing on July 24, 2008. In particular, he testified that he had legal custody of petitioner on the date of his naturalization and that they resided at that time at 121-31 Farmer's Boulevard. (Hearing Tr. at 44-45.) On cross-examination, Mr. Fisher stated that he first lived with petitioner and his mother in Brooklyn when they came to the United States in 1987, before moving to Liberty Avenue in Queens, and then moving with petitioner and petitioner's sister to 121-31 Farmer's Boulevard. (Hearing Tr. at 47.) He stated that he moved to that address in "1993, 1994, that time" and that petitioner's mother "moved out. Because what happened, she move in with us in the first floor. And then she have to find somewhere else to go. And then she move up to the second floor in the same premises. And then a month after she moved, she moved to Delevan Avenue." (Hearing Tr. at 47-48.) When asked when petitioner's mother moved to that address, Mr. Fisher replied, "I think it was in '94. I don't remember the dates. It's been awhile [sic]." (Hearing Tr. at 48.) The government noted that Mr. Fisher testified before the IJ that petitioner's mother resided with him on the second floor of 121-31 Farmer's Boulevard in 1996 and questioned him before this Court about the differing dates:

> Q. You just told me before it was 1994. Is it your testimony now that you're not sure if it was '94 or '96?
>
> A. That is what I'm saying. It has been such a long time.

(Hearing Tr. at 49.)

The government next directed Mr. Fisher to his naturalization application, wherein he listed his address as 457 Skidmore Road in Deer Park, New York. Mr. Fisher testified that he was not living there at that time, but at 121-31 Farmer's Boulevard and only provided the 457 Skidmore Road address because he "[knew] that [was] going to be a permanent house." (Hearing Tr. at 51.) He further testified that his wife at the time, Valerie, was living at the Liberty Avenue address and that he was not living with her, but would go "back and forth" between the residences. (Hearing Tr. at 51.)

The government next questioned Mr. Fisher about the addresses he listed for his four children on his naturalization application, asking why he stated that his sons from his second marriage, Michael and Korey, lived "with [him]" at 457 Skidmore Road and petitioner and his sister Stephanie resided at 121-31 Farmer's Boulevard, if Michael and Korey actually lived with their mother, his second wife, on Liberty Avenue in Queens, New York and petitioner and Stephanie lived with him at the Farmer's Boulevard address. (Hearing Tr. at 52-53.) Mr. Fisher responded that "... [petitioner] and Stephanie and me were living at Farmer's Boulevard before, before I got married. And my first son, Michael and Travis were living with Valerie Foreman. Then we get married, and then we plan to move, everybody go to

6

Long Island, which is Skidmore Road. So that is why we have two different addresses." (Hearing Tr. at 53.)

At the conclusion of the *de novo* hearing, petitioner made some arguments orally regarding his legal position. (Hearing Tr. at 64-65.) Counsel for the respondent requested an opportunity to submit a supplemental written brief to outline the government's legal position and the Court set a deadline date of August 13, 2007 for that submission. (Hearing Tr. at 65.) The Court gave petitioner until September 5, 2008 to respond to the government's submission. On August 13, 2008, respondent submitted its supplemental brief. On August 21, 2008, petitioner submitted his post-hearing memorandum to the Court. The matter is fully submitted.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

As set forth below, after conducting the *de novo* hearing and carefully considering all of the evidence (including the administrative record) and the submissions of the parties, the Court concludes that petitioner has not met his burden of demonstrating that his father had legal custody of him at the time of his father's naturalization, or at any point between his father's naturalization and petitioner's eighteenth birthday.[1] Therefore, petitioner's nationality claim must be denied.

Given that the Board of Immigration Appeals has determined that evidence of foreign birth gives rise to a presumption of alienage, *see Matter of Tijerina-Villarreal*, 13 I. & N. Dec. 327, 330-31 (BIA 1969), a petitioner claiming derivative citizenship bears the burden of proving his eligibility by a preponderance of the evidence. *See Berenyi v. Dist. Dir.*, 385 U.S. 630, 637 (1967); *Bagot v. Ashcroft*, 398 F.3d 252, 256-57 (3d Cir. 2005); *see also McConney v. INS*, 429 F.2d 626, 630 (2d Cir. 1970) (recognizing that a foreign-born individual bears the burden of proving derivative citizenship); *Leal Santos v. Gonzales*, 495 F. Supp. 2d 180, 184-85 (D. Mass. 2007). Further, any doubts regarding a petitioner's citizenship status "'should be resolved in favor of the United States and against claimant.'" *See Berenyi*, 385 U.S. at 637 (quoting *United States v. Macintosh*, 283 U.S. 605, 626 (1931)).

In the instant case, because petitioner was a minor residing lawfully in the United States at the time of his father's naturalization and his parents were legally separated, the only factual issue contested by the parties is whether petitioner's father was "the parent having legal custody" of petitioner at any time from the date of the father's naturalization on July 14, 1996 until petitioner's eighteenth birthday on October 31, 1996. If petitioner's father had legal custody of him at any point during that time period, petitioner would be entitled to citizenship under the CCA, having met all of the remaining requirements under the statute. *See Matter of Baires-Larios*, 24 I. & N. Dec. 467, 470-71 (BIA 2008) (determining that the "legal custody" requirement of the statute may be fulfilled after the parent's naturalization if it occurs prior to the applicant's eighteenth birthday); *see also Brissett v. Ashcroft*, 363 F.3d 130, 134 (2d Cir. 2004) (ruling that a divorce constitutes a "legal separation" for purposes of a CCA claim).

More specifically, because the divorce

---

[1] The Court notes that, even assuming *arguendo* that the burden was on the respondent, the Court would reach the same conclusion for the reasons set forth herein.

7

decree for petitioner's parents did not assign "legal custody" to either parent, petitioner bears the burden of proving by a preponderance of the evidence that, at the time of his father's naturalization or at any time from that date until his eighteenth birthday, his father had "actual uncontested custody" of him. *See Matter of M -*, 3 I. & N. Dec. 850, 856 (BIA 1950) (stating that "in the absence of judicial determination or judicial or statutory grant of custody... the parent having actual uncontested custody is to be regarded as having [had] 'legal custody'"); *see also Bagot*, 398 F.3d at 260 ("If state law provides no answer as to child custody, then federal courts... can fall back on the second part of the *Matter of M -* test: if state law does not fix 'legal custody,' then the federal standard of 'actual uncontested custody' applies."); *Crumpton v. Most*, 12 Misc. 3d 575, 578 (N.Y. 2006) (citing to *Bagot v. Ashcroft* for the proposition that neither New York law nor decisions issued by the state's highest court have defined the phrase "legal custody"). Further, the United States Court of Appeals for the Fifth Circuit, in adjudicating a derivative citizenship claim of an alien whose parents held a divorce decree specifying that the mother retained "sole physical custody" but both parents shared "joint legal custody," determined that Section 321(a)(3) requires that the naturalized parent have *sole* custody of the child. *See Bustamente-Barrera v. Gonzales*, 447 F.3d 388, 395-96 (5th Cir. 2006); *see Wedderburn v. INS*, 215 F.3d 795 (7th Cir. 2000) (stating that "§ 321(a) as written means that in shared-custody cases both parents must naturalize").

Federal courts adjudicating such derivative citizenship claims have found that one parent had "actual, uncontested custody" of a child if the parent housed and cared for the child with the consent of the other parent. *See Bagot*, 398 F.3d at 267; *Charles v. Reno*, 117 F. Supp. 2d 412, 418 (D.N.J. 2000). The Second Circuit has determined that residency with a parent is an important aspect of legal custody. *See, e.g., Croll v. Croll*, 229 F.3d 133, 138-39 (2d Cir. 2000) (stating that "the right to determine the 'place of residence' is an apt example of a right of custody because it is indicative: the parent who decides where the child dwells is very likely to be the parent who exercises care and control, and therefore has custody").

As set forth below, this Court concludes that petitioner has failed to demonstrate that he resided with his father at any point during the relevant time frame, as opposed to residing with his mother. Moreover, not only has petitioner failed to demonstrate residency with his father, he also has failed to submit any other credible evidence that his father had care and control of him during this time frame. On the contrary, not only is there lack of credible evidence of parental responsibility by the father, there is documentary evidence related to schooling and travel to Jamaica, which suggests that petitioner's mother was active in petitioner's life in the mid-1990s, well after the divorce from petitioner's father.

In short, after conducting the *de novo* hearing and considering all the evidence, petitioner has failed to show that his father had actual, uncontested custody at any point from the time of the father's naturalization until petitioner's eighteenth birthday.

A. Failure to Show Residency with Father

Much of the testimony in the removal proceedings and before this Court focused on petitioner's residence as indicative of whether his father retained "actual,

8

uncontested" custody of him. However, petitioner's testimony and that of his father that they resided together during the relevant time frame in 1996 was utterly lacking in credibility.

First, petitioner's sworn testimony on the residency issue has been inconsistent and contradictory in material respects over time. For instance, petitioner first testified in removal proceedings that he lived with his father at "457 Deer Park Avenue" from 1993 through 1997 and that his mother did not reside with them. However, his testimony later in removal proceedings and before this Court was that he lived at 121-31 Farmer's Boulevard during that same time period and that his mother did reside with them for a certain amount of time there.

Mr. Fisher's testimony before the IJ and again before this Court was similarly contradictory and not credible. He first stated via sworn affidavit that he lived with petitioner, petitioner's sister Stephanie and petitioner's mother at the 121-31 Farmer's Boulevard address from 1987 until 1997 and that petitioner's mother moved out in 1994. He then testified before the IJ that she moved out in 1996. Before this Court, he maintained that it was 1994. He further testified that in 1987, he lived with petitioner, petitioner's sister and petitioner's mother in Brooklyn, New York before moving to Queens, New York and then to St. Alban's, New York, in direct contradiction of the affidavit he submitted to the IJ.

Not only was the testimony of petitioner and his father not credible because of the material internal inconsistencies in their own accounts, as well as with each other's statements, the most compelling documentary evidence – namely, Mr. Fisher's sworn naturalization application – completely contradicts their contention that petitioner resided with his father at the Farmer's Boulevard address at the time of naturalization. Specifically, Mr. Fisher's naturalization application – which was signed and sworn before an immigration officer on June 25, 1996, some three weeks before Mr. Fisher's naturalization – states that Mr. Fisher lived at 457 Skidmore Road in Deer Park, New York, *not* 121-31 Farmer's Boulevard in St. Alban's, New York, as he stated in these proceedings. Mr. Fisher's explanation for the discrepancy – namely, that he put down the Deer Park address because he intended to move to the 457 Skidmore Road residence at a later date – was not credible, particularly in light of the fact that Mr. Fisher represented elsewhere in the application that his children from another marriage resided with him, while petitioner's address was 121-31 Farmer's Boulevard. In particular, Mr. Fisher stated in his application that petitioner resided at the 121-31 Farmer's Boulevard address, while two of his other children resided "with me." Thus, he was unable to provide a credible explanation as to why he failed to state on the application that petitioner also lived with him, if in fact that was the situation at the time.

The documentary evidence submitted by petitioner also does not provide credible evidence to support his contention in light of the entire record. For example, the invoices from "Mike Home Improvements" may indicate that Mr. Fisher ran his business from the St. Alban's residence in 1996, but does not resolve where petitioner was residing at that time and certainly does not resolve the critical contradictions between Mr. Fisher's naturalization application and his testimony before this Court.

Similarly, although petitioner relies heavily on the one-page affidavit from his

mother (Janet Fisher) submitted during the removal proceedings, the Court does not find that affidavit credible in light of the entire record. For example, in the affidavit, Ms. Fisher states in a cursory fashion the following: "In 1994 I moved to 113-11 Delevan Street, Queens Village, New York. Our son and daughter remained in St. Albans, New York with their father. I still reside at the Queens Village address." (R. at 247.) The language tracks the language of the father's affidavit. (R. at 249.) However, Ms. Fisher's affidavit fails to mention that Ms. Fisher lived upstairs at the 121-31 Farmer's Boulevard for some period of time in 1996. For example, Mr. Fisher testified at the removal hearing:

> MR. MESSINGA [Counsel for Ricardo Fisher] TO MR. FISHER
>
> Q. In July of 1996, which address was your primary residence where you kept your clothes and slept? Which was your primary residence in July of '96?
>
> A. It was Farmer's Boulevard.
>
> JUDGE FOR THE RECORD
>
> [Ricardo Fisher] claims primary residence in July '96 was Farmer's Boulevard. That was 121-31 Farmer's Boulevard.
>
> JUDGE TO MR. FISHER
>
> Q. Who was living there at that time?
>
> A. Ricardo Fisher and Stephanie Fisher and their mother was living on the second floor.
>
> Q. Their mother meaning Janet?
>
> A. Janet, yes.
>
> Q. Did the respondent live with his mother on the second floor?
>
> A. No, he lived with me.
>
> Q. So, his mother was alone on the second floor?
>
> A. Yeah, she was alone on the second floor, yeah.

(R. at 182.) These types of unexplained discrepancies and inconsistencies between Ms. Fisher's affidavit and the other evidence in the record lead the Court to conclude that it, like the testimony of petitioner and Mr. Fisher, is unreliable.

In his post-hearing submission, petitioner attempts to reconcile these inconsistencies. For example, with respect to the above-referenced discrepancy, he argues that his mother only resided upstairs for one week in 1996, while she was looking for a new place to live. However, at the hearing before this Court, petitioner first testified that Ms. Fisher never resided at the 121-31 Farmer's Boulevard address after 1994 and then testified that he could not recall exactly when his mother lived with them at that address. (*See* Hearing Tr. at 21 ("Q. Did your mother ever move back to the 121-31 Farmers Boulevard address after moving to the Delevan Street [in 1994]? A. No, ma'am."); Hearing Tr. at 22-23 ("Like I said, the dates, the dates are – she was, she was living there

at one particular point and moved out. As far as my recollection of it, I'm not too sure of the dates.").) Similarly, Mr. Fisher first testified before this Court that Ms. Fisher was only there for a "couple of weeks" while she found another place to live, but then stated on cross-examination that he really could not recall the dates she was there:

> Q. According to the transcript, you were asked a question by the Immigration Judge about where you were living in July of 1996. And there are some questions about where Janet was living at that time. And you indicated that she was living on the second floor in 1996.
>
> A. As I said, your Honor, it has been a long time, you know.
>
> Q. You don't remember if she was living there in 1996?
> A. I know she was living on the second floor with us there, but it has been such a long time, you know.
>
> Q. You just told me before it was 1994. Is it your testimony now that you're not sure if it was '94 or '96?
>
> A. That is what I'm saying. It has been such a long time.

(Hearing Tr. at 49.)

Not only are Mr. Fisher's lack of memory and contradictions troubling, but Ms. Fisher's failure to mention and explain this period of time in 1996 in her affidavit when she was living at 121-31 Farmer's Boulevard, as well as the failure to explain other inconsistencies between her affidavit and the record, makes her statement unreliable. At the hearing, although petitioner was in contact with his mother by telephone on the day of the hearing and the Court emphasized to petitioner the importance of having her as a witness, petitioner nevertheless declined to call her as a witness. In fact, the Court made clear to petitioner that he would compel Ms. Fisher to testify with a subpoena and would make any reasonable accommodation in terms of scheduling her testimony to address her work schedule. However, petitioner clearly chose not to call her as a witness to attempt to explain these omissions and discrepancies.[2]

---

[2] For example, the Court stated to petitioner: "But I'm going to emphasize to you that obviously it is an important hearing. This is your opportunity to present whatever evidence you believe supports your position here. And if that includes your mother's testimony as something you want to have as part of that, I would issue a subpoena to both your father and your mother requiring them to come on a certain date to give this testimony. And I'm certainly sensitive to the fact that people have various issues in terms of being able to come here. But I will accommodate either of them, if they want to testify, you know at nine o'clock in the morning, if they want to testify at four o'clock in the afternoon because of their work schedule, whatever other schedule. I'll try my best to accommodate them, so that they can give this testimony." (Hearing Tr. at 39-40.) After petitioner's father arrived and testified, the Court asked petitioner again about his mother's testimony and petitioner responded, "To be honest with you, your Honor. I feel like my mom, she has been through so much, you know, in her life. I just don't want to put her through this predicament to come...." (Hearing Tr. at 61.) The Court then again stated, "I don't need to hear the reasons. It is your decision. It is up to you. I just want you to understand that if her testimony is important to your case, that I will have a subpoena issued for her to come here. I would make whatever accommodations she would need in order to be here, whatever time, or whatever day. Okay?" (Hearing Tr. at 61.) Petitioner

11

In short, the testimony and documentary evidence presented by petitioner regarding residency was rife with contradictions and was simply not credible. Thus, the Court finds that he did not establish that his father housed and cared for him at the time of naturalization on July 14, 1996, or at any point between that date and petitioner's eighteenth birthday on October 31, 1996.

### B. Failure to Show any Other Evidence Demonstrating Legal Custody

Of course, the Court recognizes that residency is not necessarily the sole indicator of "actual, uncontested custody." Therefore, although the petitioner focused unsuccessfully on trying to demonstrate residency with his father, the Court did not end the analysis on that issue. Instead, the Court also carefully reviewed the record and analyzed whether there is any other evidence, even in the absence of petitioner demonstrating residency with his father, that would support the conclusion that Mr. Fisher had legal custody of petitioner. After conducting that review, the Court concludes that there is no other evidence that would support finding that petitioner was in the legal custody of his father. To the contrary, the other evidence submitted suggests that, even after the divorce, petitioner's mother maintained an active parenting role in his life, meaning that his father did not have "sole" custody. *See Bustamente-Barrera*, 447 F.3d 388, 395-96 (alien petitioner who resided solely with his mother could not derive citizenship through her naturalization because his non-citizen father retained visitation rights). For example, petitioner's high school transcript, issued for the dates spanning September of 1993 through January of 1995, lists only his mother's name;

the field designated for "father's name" is blank. Moreover, petitioner testified before this Court that he traveled to Jamaica with his mother sometime around his sixteenth birthday and, as noted *supra*, both petitioner and his father provided sworn statements at various points suggesting that his mother shared a residence with them for some period of time in 1996, the year that Mr. Fisher was naturalized.[3] Though these pieces of evidence address the time period preceding Mr. Fisher's naturalization (rather the one following it), the Court finds this evidence of shared parental responsibilities and privileges undermines the suggestion by petitioner and Mr. Fisher (as well as by Ms.

---

stated, "I think, your Honor, I think my father's testimony is fine." (Hearing Tr. at 61.)

[3] The Court notes that petitioner's inconsistent answers during the *de novo* hearing on the issue of travel were extremely evasive and suggested a clear lack of candor. Specifically, when shown his passport with travel to Jamaica in 1993 (when petitioner was fourteen years old) and 1995 (when petitioner was sixteen years old), petitioner initially denied (in response to several questions) that he had any recollection that he traveled to Jamaica (or whom he travelled with), but did not dispute the trips on the passport. (*See, e.g.,* Hearing Tr. at 26 ("I don't recall traveling to Jamaica, but like I said if you see my picture, I was young at the time. It doesn't precisely say who I traveled with, either.").) Those answers were completely lacking in credibility. In fact, after further questioning, petitioner finally acknowledged that he recalled trips to Jamaica. (*See, e.g.,* Hearing Tr. at 28 ("Your Honor, I remember traveling to Jamaica with my mom. I remember also traveling to Jamaica with my father...."); Hearing Tr. at 30 ("But I'm going to be honest with you and say, yeah, I did go to Jamaica with my mom. And I also did go to Jamaica with my father. But I don't think that takes away the point that my father had custody of me.").) Moreover, although petitioner claimed that his father also took him to Jamaica during at least one trip, his father denied at the hearing that he went to Jamaica with petitioner on either of those dates. (*See* Hearing Tr. at 53-54 ("Q. And during those years, between 1993 and 1996, did Ricardo travel to Jamaica? A. Yes. Q. And who did he travel with? A. With his mom.").).

Fisher in her affidavit) that, as of 1994, Ms. Fisher was not living with petitioner and did not have a role after that time in raising the petitioner. In short, having failed to demonstrate residency with his father, petitioner has also failed to provide any other forms of credible evidence that could support a finding of legal custody – that is, actual, uncontested custody over petitioner – by his father during the relevant time frame.

### III. CONCLUSION

For the foregoing reasons, after conducting a *de novo* hearing and viewing the evidence in its totality, the Court concludes that petitioner did not carry his burden of proof in establishing that his father was the "parent having legal custody" at the time of the father's naturalization, or any point between the date of his father's naturalization and that of petitioner's eighteenth birthday. Therefore, petitioner does not meet the conditions set forth in Section 321(a)(3) and did not acquire derivative citizenship when his father became a naturalized United States citizen or at any time thereafter. Accordingly, petitioner's nationality claim is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: October 21, 2008
Central Islip, NY

\* \* \*

Petitioner appears *pro se*, Orange County Correctional Facility, 110 Wells Farm Road, Goshen, NY 10924. The attorney for respondent is Dione M. Enea, Esq. of the United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY, 11201-1820.